## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL COX,                                   :          No. 4:22cv1824
                                               :
                                    Plaintiff  :          (Judge Munley)
                                               :
                                v.             :          FILED
                                               :          SCRANTON
BERNADETTE MASON, *et al.,*                    :
                                               :          DEC 2 2 2025
                                    Defendants :
                                               :          PER _____
                                                          DEPUTY CLERK

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Michael Cox ("Cox"), a former inmate of the Pennsylvania Department of Corrections[1], commenced this civil rights action pursuant to 42 U.S.C. § 1983, in the Court of Common Pleas of Berks County, Pennsylvania on August 24, 2022. (Doc. 1-3). Shortly thereafter, defendants removed the action to the United States District Court for the Eastern District of Pennsylvania. (Doc. 1). Defendants subsequently moved to transfer venue to this court because the events at issue arose at the State Correctional Institution, Mahanoy, in Frackville, Pennsylvania ("SCI-Mahanoy"), which is located within the territorial boundaries of the Middle District of Pennsylvania. (Docs. 3, 5).

The matter proceeds via an amended complaint. (Doc. 37). The sole remaining defendant is Jenna Williams, Certified Physician's Assistant ("PA").

---

[1] Cox has been released from custody. (See Doc. 90).

Presently before the court is defendant's motion (Doc. 97) for summary judgment pursuant to Federal Rule of Civil Procedure 56. Cox failed to respond to the motion and the time for responding has now passed.[2] Therefore, the motion is deemed unopposed and ripe for resolution. For the reasons set forth below, the court will grant the motion.

## I.    **Allegations of the Amended Complaint**

Cox was incarcerated at SCI-Mahanoy at all relevant times. According to the amended complaint, he began experiencing numbness in his hands and feet on January 4, 2021. (Doc. 37, at 6-7). Defendant Williams, a physician's assistant in the prison, treated Cox during a sick call on January 4, 2021. (Id.). At this visit, Cox allegedly informed defendant Williams that he believed his situation was serious, and he requested a Magnetic Resonance Imaging ("MRI") test, which he did not undergo. (Id. at 7). Cox alleges that he became "disabled" after January 4, 2021, and he needed a walker or wheelchair to ambulate. (Id. at 6-7).

Cox asserts that his first sick call visit was on January 4, 2021, and "[a]fter that it was week after week." (Id. at 6).

---

[2] Cox was directed to file a brief in opposition to defendant's motion and was admonished that failure to file an opposition brief would result in defendant's motion being deemed unopposed. (Doc. 102) (citing M.D. PA. LOCAL RULE OF COURT 7.6).

On February 18, 2021, when Cox was waiting to be transferred to the emergency room at an outside hospital, he encountered defendant Williams.  (Id. at 8).  She allegedly stated that Cox was lying about his symptoms.  (Id. at 6, 8).  Cox contends that defendant Williams deliberately withheld treatment for 8½ to 9 weeks.  (Id. at 8).  During these 8½ to 9 weeks, Cox asserts that his condition worsened, and he was unable to walk or feel his legs.  (Id.).  The amended complaint sets forth a claim for deliberate indifference to a serious medical need against defendant Williams.  (Id.).  Specifically, Cox states his claim as follows:

> Eighth Amendment violation: Deliberate Indifference when PA Jenna Williams called Plaintiff a faker and li[a]r on February 18, 2021, when Plaintiff was waiting to go to the emergency room at Pottsville PA. This showed the Plaintiff that she really wasn't treating Plaintiff for 8½ to 9 weeks.  That whole time she thought Plaintiff was lying so basically she thought the Plaintiff should not have treatment.  PA Williams let it go for almost 9 weeks, by then Plaintiff couldn't feel his legs, let[] alone walk.

(Id.) (sic).

## II.    Statement of Undisputed Facts[3]

Defendant attached to her summary judgment motion over 700 pages of Cox's medical records while he was incarcerated.  (Doc. 97-1).  The court has comprehensively reviewed these records, and recites the facts as follows.

PA Williams saw Cox on January 8, 2020, to check his blood pressure. (Doc. 98 ¶ 2).  He reported taking his medications as ordered without any side effects.  (Id.).  He denied any headaches, lightheadedness, dizziness. On exam, there were no signs of edema.  (Id.).  However, there was some positive gait disturbance noted.  (Id.).  Cox had limited flexion and extension of the back. (Id.).  PA Williams noted that his last epidural injection was in January 2019. (Id.).  Following an exam, PA Williams noted that there was no change in

---

[3]  Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from defendant's Rule 56.1 statement of material fact.  (Doc. 98).  Cox failed to file a response to defendant's statement of material facts.  Therefore, as authorized by Local Rule 56.1, the court will admit as uncontroverted the statement of facts submitted by defendant.  See M.D. PA. LOCAL RULE OF COURT 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.");  see also Rau v. Allstate Fire & Cas. Ins. Co., 793 F. App'x 84, 87 (3d Cir. 2019) (upholding district court's decision to strike non-movant's non-responsive counterstatement of facts under Local Rule 56.1);  Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 613 (3d Cir. 2018) (finding that "the District Court is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance");  see also Doc. 102 ¶ 2 (advising Cox that failure to file a responsive statement of material facts would result in the facts set forth in defendant's statement of material facts being deemed admitted).

medications needed.  (Id.).  She planned to enter a consult to request another right back epidural injection due to pain in Cox's lower back that radiates with neuropathy in his right leg.  (Id.).

On June 9, 2020, Dr. Loscalzo saw Cox to renew his chronic care clinic medications.  (Id. ¶ 3).  Cox reported that Ibuprofen was effective at controlling his chronic radicular pain.  (Id.).  He was in no acute distress during the visit.  (Id.).  His gait was noted as being "measured."  (Id.).

Dr. Loscalzo noted on January 3, 2021, that Cox's chronic care clinic medications were renewed.  (Id. ¶ 4).

On January 4, 2021, Dr. Loscalzo saw Cox for his report of a flare-up of chronic back pain.  (Id. ¶ 5).  It was noted that he walked with a cane.  (Id.).  It was also noted that Cox had a peripheral nerve block scheduled for June 17, 2020, but he refused the procedure due to concerns related to the COVID-19 pandemic.  (Id.).  After discussing possible treatment options, Cox agreed to a Prednisone taper at that time.  (Id.).  He would follow-up in sick call as needed. (Id.).

PA Williams saw Cox on January 11, 2021, for his complaint that his back pain was not getting any better despite being provided steroids. (Id. ¶ 6).  He noted that the pain was in his back and radiating to his legs.  (Id.).  He reported using a cane for mobility.  (Id.).  Cox noted that he had X-rays

5

performed previously, but he believed they were obtained in 2015. (Id.). He

denied any recent injuries or heavy lifting and he denied any recent falls or

issues with his bowels or bladder. (Id.). It was noted that he was seen on

January 4th for the same issue, at which time it was acknowledged that he was

scheduled for a nerve block in June 2020; however, he declined the procedure

due to concerns with COVID-19. (Id.). PA Williams planned to obtain an X-ray of

the spine for diagnostics and further evaluation. (Id.). She noted that Cox had

active orders for Motrin and Prednisone. (Id.). PA Williams advised Cox that

further treatment options would be dependent on the X-ray results. (Id.). She

also discussed stretches and exercises with him. (Id.). Cox was to follow-up in

sick call as needed. (Id.).

   On January 12, 2021, registered nurse ("RN") Michelle Donovan completed

a musculoskeletal pain nursing evaluation tool for Cox's complaint that he was

having trouble walking that morning. (Id. ¶ 7). Cox also reported numbness to

his hands and that "they won[']t give me nerve medication for it." (Id.). He also

said he needed a new MRI. (Id.). Cox reported that his complaint had been

ongoing for 2½ weeks. (Id.). He was then escorted to medical where he saw Dr.

Baddick. (Id.). Dr. Baddick planned to obtain an X-ray the next day. (Id.). Cox

then returned to his block. (Id.).

Cox underwent an X-ray of his cervical spine on January 13, 2021.  (Id. ¶ 8).  The study revealed straightening of the normal cervical lordosis and no radiographic evidence of an acute fracture.  (Id.).  He also underwent an X-ray of his lumbar spine that revealed spondylytic changes of the dorsal spine.  (Id.).

Dr. Loscalzo saw Cox on January 19, 2021, for his report of progressive worsening of chronic back pain.  (Id. ¶ 9).  Cox reported instability of ambulation with a single cane.  (Id.).  He did not report improvement with a recent Prednisone taper.  (Id.).  Dr. Loscalzo discussed options for evaluation.  (Id.).  Dr. Loscalzo submitted a request for a neurosurgical evaluation.  (Id.).  The plan was to follow-up in sick call as needed.  (Id.).

On January 25, 2021, PA Williams saw Cox at sick call.  (Id. ¶ 10).  Cox complained that no medication was helping his back pain.  (Id.).  He noted that, the prior summer, he refused to undergo a shot in his back due to concerns with COVID-19.  (Id.).  On exam, Cox walked slowly even with assistance of walker.  (Id.).  He had limited flexion and extension due to pain.  (Id.).  PA Williams discussed Cox's medications with him, including possible side effects.  (Id.).  She entered a consult to potentially reschedule a nerve block.  (Id.).  She also discussed continuation of the walker for assistance, and she instructed him on stretches and exercises related to the back.  (Id.).  Cox was also encouraged to rest, and return as necessary.  (Id.).

7

RN Winnie Chauvel completed a "dizziness" nursing evaluation tool on February 13, 2021, for Cox's complaint that he lost balance due to his back pain, causing him to fall backwards. (Id. ¶ 11). She noted that a call was received from the block that Cox had fallen backwards. (Id.). He was assisted from the floor to a chair and brought to medical for further assessment. (Id.). He had a history of lower back pain and was using a walker for ambulation. (Id.). Cox stated that his condition started to degenerate about six weeks earlier. (Id.). He reported that his ability to walk had degenerated. (Id.). On exam, he reported a pain level of 7/10. (Id.). He denied pain radiating to the other side of his body. (Id.). The provider on call was made aware, and then ordered Toradol 30mg, which was provided to Cox as directed. (Id.). He was also provided Robaxin 750mg. (Id.). It was noted that Cox would be seen in follow-up at sick call. (Id.). He was also provided a wheelchair. (Id.).

On February 15, 2021, PA Williams saw Cox at sick call, at which time he reported that he fell due to the pain in his back and legs. (Id. ¶ 12). He reported that he was provided Pamelor, but he stopped taking it because it made him feel funny and made his heart race. (Id.). Cox said that he fell because he had nothing to grab onto in his cell. (Id.). He denied hitting his head. (Id.). He stated, "[t]he fall just happened but I don't think anything changed from it." (Id.). He appeared for the exam in his wheelchair; he was unable to stand up from the

chair. (Id.). Cox was able to lift his right and left leg off the wheelchair, albeit slowly and with difficulty. (Id.). No edema was present. (Id.). The plan was to taper down Pamelor due to the side effects. (Id.). Cox was to be approved for a peripheral nerve block. (Id.). Restrictions were placed for him to be housed closer to medical and to be provided a handicap cell. (Id.). Cox was instructed to return to sick call as needed. (Id.).

PA Williams saw Cox at sick call on February 18, 2021, due to his complaints of back pain. (Id. ¶ 13). He reported that the pain was worsening and now he could not feel his legs. (Id.). He reported that during the night, he had to urinate but was unable to get out of bed. (Id.). He also reported difficulties with urination due to a limited stream. (Id.). PA Williams noted that Cox had been seen several times due to his back pain that was becoming worse. (Id.). The examination was limited due to Cox stating that he could not lift either leg despite trying to. (Id.). An assessment included back pain with loss of sensation and decreased movement of the lower extremities bilaterally. (Id.). PA Williams then discussed Cox's case with Dr. Loscalzo. (Id.). It was determined that Cox would be sent to the emergency department for further evaluation. (Id.).

On February 18, 2021, Cox was transported to the emergency room per Dr. Loscalzo's direction for complaints of back pain with loss of

sensation to his legs bilaterally. (Id. ¶ 14). Prior to sending him to the hospital, RN Winnie Chauvel noted that Cox complained of increased loss of sensation to his lower legs and, to a lesser extent, loss of sensation to his hands. (Id.). Because his condition was becoming progressively worse over the last seven weeks, Dr. Loscalzo had Cox transported to the emergency room for further evaluation. (Id.).

Cox was admitted to Lehigh Valley Health Network Cedar Crest on February 18, 2021, where he remained until his discharge on February 23, 2021. (Id. ¶ 15). While at the hospital, Cox was evaluated by neurosurgery, who recommended a C4-C5 and C6 laminectomies and partial C7 laminectomy. (Id.). It was noted that about seven weeks earlier, Cox admitted to reading a book laying on his back. (Id.). Per the record, Cox reported feeling a sudden jolt in his back and, since then, symptoms of bilateral leg weakness had progressively worsened. (Id.). Cox told the provider that he previously worked as a construction worker prior to his incarceration. (Id.). Cox underwent the recommended surgery. (Id.). Following surgery, he was seen by occupational therapy at the hospital. (Id.). Cox was able to walk very slowly with a walker. (Id.). He required a wheelchair for long distances. (Id.).

On February 23, 2021, at approximately 3:00 p.m., Cox returned to SCI-Mahanoy after undergoing a laminectomy and fusion. (Id. ¶ 16). He returned

wearing a cervical collar. (Id.). Fifteen staples were observed intact to the nape of his neck. (Id.). The incision was clean, dry, and intact. (Id.). Cox's mobility was limited, so he was provided with a walker. (Id.). Dr. Baddick was alerted to Cox's complaints of pain. (Id.).

On February 24, 2021, Dr. Baddick issued an initial order, directing Cox to remain in the infirmary under 23-hour observation after being discharged from the hospital. (Id. ¶ 17). Dr. Baddick noted that he spoke to the attending hospital physician the day before. (Id.). It was noted that Cox would require infirmary admission with maintenance of his cervical collar and remain upright in bed to reduce cervical inflammation. (Id.). Dr. Baddick noted that Cox was alert, oriented, and in no acute distress. (Id.). His only complaint at that time was increased pain at rest. (Id.). It was noted that Cox had severe weakness and denervation changes to his lower extremities bilaterally, and that he required assistance with ambulation and activities of daily living in his cell. (Id.). The plan was to continue 23-hour observation in the infirmary and to continue care as ordered. (Id.). Dr. Baddick also placed a consult request that day for Cox to follow-up with the neurosurgeon. (Id.).

On February 25, 2021, Dr. Baddick saw Cox when he was in the infirmary. (Id. ¶ 18). Cox only complained of increased pain at night. (Id.). Dr. Baddick noted that he had orders for analgesic medications, but the medications had not

yet been delivered by the on-site pharmacy. (Id.). The plan was to continue infirmary care as ordered and to have Cox follow-up with the neurosurgeon as scheduled. (Id.). Medical staff continued to monitor Cox through the rest of the day. (Id.).

Dr. Baddick saw Cox in the infirmary on February 26, 2021, at which time Cox had increased weakness in his right upper extremity. (Id. ¶ 19). Dr. Baddick planned to continue infirmary care as ordered. (Id.). He also planned to increase Cox's ambulation with a walker device and two-to-one assistance for contact guard. (Id.).

On February 27, 2021, Dr. Baddick again treated Cox in the infirmary. (Id. ¶ 20). Cox reported that his complaint of hiccup disorder had improved, and that he was feeling well. (Id.). He was also observed wearing his cervical collar, and his surgical wound was clean and dry. (Id.).

The following day, February 28, 2021, Dr. Baddick treated Cox in the infirmary. (Id. ¶ 21). Cox denied any new complaints. (Id.).

On March 1, 2021, Dr. Baddick saw Cox in the infirmary. (Id. ¶ 22). He made no new complaints. (Id.). The plan was to continue infirmary care and to follow-up with neurosurgery. (Id.).

Dr. Baddick saw Cox on March 2, 2021, at which time he appeared in no acute distress. (Id. ¶ 23). The plan was to continue care as ordered, and to

follow-up with neurosurgery as scheduled. (Id.). Dr. Baddick also added Senokot and Colace to Cox's medication regimen. (Id.).

On March 3, 2021, RN Winnie Chauvel completed a Medical Incident Report, noting that Cox was transported to the emergency room on February 18, 2021 for evaluation. (Id. ¶ 24). RN Chauvel noted that Cox was sent to the ER on February 18, 2021 due to his chronic lower back pain and increased loss of sensation to bilateral lower extremities. (Id.). RN Chauvel noted that Cox was not able to get out of bed due to increased paralysis to lower extremities. (Id.).

Cox continued to be monitored in the infirmary after his cervical spine surgery. (Id. ¶ 25).

On March 5, 2021, Cox had a follow-up visit at Lehigh Valley Health Clinic Neurology. (Id. ¶ 26). Dr. Lycette treated Cox as a post-surgical follow-up and for removal of his staples. (Id.). Cox reported improvement of the numbness to his legs. (Id.). It was noted: "He has made some slow, steady improvement overall." (Id.). On examination, the incision site was healing well and there were no signs of infection. (Id.). Following a review of recent imaging studies, Cox was noted as being status/post cervical fusion. (Id.). His surgical staples were removed without difficulty. (Id.). He was advised to return in two weeks with updated X-ray studies. (Id.).

Dr. Baddick saw Cox on March 5, 2021, when he was in the infirmary. (Id. ¶ 27). It was noted that Cox had a consult with neurosurgery and had his staples removed that day. (Id.). Cox was medically cleared for showers. He was advised to stand first, remove his neck collar, and then shower with assistance. (Id.). It was noted that Cox had ongoing pain and weakness in the upper and lower extremities bilaterally. (Id.). The plan was to continue the care plan as directed by neurosurgery and discontinue Nortriptyline and Oxycodone. (Id.). Cox was prescribed Ultram 50mg. (Id.).

On March 6, 2021, PA Williams attempted see Cox while he was in his cell for rounds, but he stated, "I don't want to see you. I want to see a different provider." (Id. ¶ 28). When PA Williams said that she was the only provider available, Cox stated, "then I want a supervisor or white shirt." (Id.). Cox stated that he did not want to have an examination by PA Williams and stated, "[y]ou lied about me." (Id.). PA Williams explained again that she was the only practitioner doing rounds and on call for the weekend. (Id.). He instructed her to "please just leave my room. I don't want to see you." (Id.). Per Cox's request, PA Williams left the infirmary cell without an examination being completed. (Id.). Later that day, other medical providers saw Cox. (Id.).

PA Williams noted that she saw Cox on March 7, 2021, while she was in the infirmary for rounds. (Id. ¶ 29). Cox refused to be seen by her for

14

examination and evaluation, stating: "My lawyer advised me not to talk to you." (Id.).  PA Williams and RN Donovan noted his refusal.  (Id.).  Cox continued to be monitored throughout the day by other medical staff.  (Id.).

On March 8, 2021, Dr. Baddick saw Cox when he was in the infirmary.  (Id. ¶ 30).  Cox only complained of feeling weak and dizzy.  (Id.).  He had a cervical collar in place.  (Id.).  He was in no acute medical or neurological distress at that time.  (Id.).  Dr. Baddick planned to add Melantonin to help with Cox's sleep and planned to change Motrin from "as needed" to a straight order.  (Id.).  Dr. Baddick also added Omeprazole and Carafate to help with stomach ailments.  (Id.).  The plan also included obtaining new lab work due to increased fatigue.  (Id.).

Dr. Baddick saw Cox on March 9, 2021, when he was in the infirmary.  (Id. ¶ 31).  Cox requested to stop his Neurontin (Gabapentin) because it was making him tired and weak.  (Id.).  He also requested to discontinue his stool softeners. (Id.).  Cox reported that he was otherwise doing well and was in no acute medical distress.  (Id.).  On exam, his neurological signs were stable.  (Id.).  No acute neurovascular changes at that time.  (Id.).  The plan was to continue infirmary care and to discontinue medications as requested.  (Id.).

On March 10, 2021, Dr. Baddick saw Cox when he was in the infirmary. (Id. ¶ 32).  Cox reported feeling better after a discontinuance of Neurontin and cathartic medications.  (Id.).  He denied any increase of pain or numbness into

the extremity, he reported feeling very good that day, and he was in no acute medical distress. (Id.). The plan was to continue with infirmary care as ordered. (Id.).

Dr. Baddick saw Cox in the infirmary from March 11-15, 2021. (Id. ¶ 33). Cox made no new complaints during these visits. (Id.). The plan was to continue infirmary care as ordered. (Id.).

On March 16, 2021, Dr. Baddick saw Cox when he was in the infirmary. (Id. ¶ 34). Cox appeared alert, oriented, and in no acute distress. (Id.). The plan was to continue infirmary care as ordered and to follow-up with the neurosurgeon later that week. (Id.). Medical staff continued to monitor Cox throughout the day. (Id.).

Dr. Baddick again saw Cox on March 17, 2021, while he was housed in the infirmary. (Id. ¶ 35). Dr. Baddick planned to follow-up with neurosurgery later that week to discuss discharge disposition. (Id.). Cox continued to be monitored throughout the day by medical staff. (Id.).

On March 18, 2021, medical staff continued to monitor Cox while he was in the infirmary. (Id. ¶ 36).

Dr. Baddick also saw Cox on March 18, 2021, at which time it was noted that Cox was wearing his cervical collar. (Id. ¶ 37). The surgical wound

appeared to be well-healed.  (Id.).  Cox did not make any new complaints at that time.  (Id.).

Cox was again monitored in the infirmary on March 19, 2021.  (Id. ¶ 38).  Providers and nurses regularly treated Cox when he was in the infirmary throughout March and until his discharge from the infirmary on April 20, 2021.  (Id. ¶ 39).

Dr. Baddick also saw Cox on March 19, 2021, at which time he noted that Cox was alert, oriented, and in no acute distress.  (Id. ¶ 40).  He was wearing his cervical collar, and the surgical wound was well-healed.  (Id.).  Cox made no new complaints at that time.  (Id.).  The plan was to follow-up with neurosurgery the following day to discuss discharge disposition.  (Id.).

On March 31, 2021, Cox underwent an X-ray of his cervical spine.  (Id. ¶ 41).  The study revealed spondylytic degenerative changes, straightening of the cervical lordosis, and interval postsurgical stabilization.  (Id.).

Dr. Baddick placed a consult request on April 19, 2021 for Cox to participate in physical therapy.  (Id. ¶ 42).  Dr. Baddick requested that a physical therapy plan be developed for Cox to increase his overall strength.  (Id.).

On April 20, 2021, Cox was discharged from the infirmary.  (Id. ¶ 43).  Per Dr. Baddick's order, he was discharged to a handicap cell with a wheelchair and walker, and he was restricted to bottom bunk/bottom tier.  (Id.).

Cox saw PA Donald O'Brien on June 15, 2021, for his complaints of pain to his neck and left upper extremity. (Id. ¶ 44). Cox requested to have his Neurontin returned back to 400mg, three times daily, and he reported stopping his physical therapy. (Id.). PA O'Brien referred Cox to a physician regarding his pain management. (Id.). He also advised Cox that physical therapy was ordered for his recovery, and he should not stop physical therapy. (Id.). Cox was directed to return to sick call as needed. (Id.).

On July 7, 2021, Cox underwent an X-ray of his cervical spine. (Id. ¶ 45). The study revealed spondylytic degenerative changes, straightening of the cervical lordosis, and postsurgical stabilization. (Id.).

Dr. Baddick saw Cox on July 7, 2021, and noted that a neurosurgery appointment was being scheduled. (Id. ¶ 46). Cox reported being able to stand with mild assistance; however, he said that he still has difficulty walking. (Id.). He also reported issues with sleeping. (Id.). Dr. Baddick planned to refer him to psychiatry for sleep issues, to obtain a neurosurgery appointment, and to increase Neurontin (Gabapentin) to 400mg, three times daily. (Id.).

Dr. Bora Saikia saw Cox on August 19, 2021. (Id. ¶ 47). The plan was to have Cox follow-up with the site medical director regarding his chronic pain and to continue Gabapentin.

On September 28, 2021, Dr. Baddick saw Cox for a follow-up visit. (Id. ¶ 48). Cox reported that he still had increased pain into the left upper extremity, with no right upper extremity pain at that time. (Id.). Dr. Baddick added Celebrex 200mg and Baclofen 10mg to his medication regimen. (Id.). Cox was to follow-up with the neurosurgeon and to return to the medical line in four weeks. (Id.).

On October 4, 2021, Cox had a neurosurgery follow-up with Dr. Lycette at Lehigh Valley Neurosurgery. (Id. ¶ 49). Dr. Lycette planned to obtain a new MRI and CT scans of the cervical spine. (Id.). He also suggested Lyrica for pain management and planned to see Cox again after the imaging was available. (Id.).

On October 13, 2021, Dr. Baddick saw Cox for a follow-up visit. (Id. ¶ 50). Dr. Baddick noted that Cox was to undergo CT and MRI scans, as ordered by neurosurgery. (Id.). Dr. Baddick noted that after he reviewed the reports, he would consider a consultation to a pain management specialist. (Id.).

PA Kyle Mummey saw Cox on October 18, 2021, at which time Cox requested a renewal of Xoponex. (Id. ¶ 51). He otherwise reported feeling well overall. (Id.).

PA Williams saw Cox on October 25, 2021, for his complaints of swelling of the ankles and feet. (Id. ¶ 52). PA Williams planned to request CT and MRI

scans. (Id.). She also reordered his Baclofen, provided him with Ted Hose stockings, ordered new lab work, and scheduled Cox to see the physician. (Id.).

On November 2, 2021, PA Williams entered a consult request for Cox to undergo an MRI of cervical spine. (Id. ¶ 53). She noted that the neurosurgeon saw Cox on October 4, 2021, and he was requesting a repeat MRI of the cervical spine after his cervical fusion in February 2021. (Id.). An appointment was scheduled for March 25, 2022. (Id.). PA Williams also placed a request for a repeat CT scan. (Id.).

PA Williams saw Cox on November 8, 2021, due to his request to review his labs and recent X-ray studies. (Id. ¶ 54). During the exam, Cox was able to stand up from the chair without any assistance. (Id.). He had full range of motion and strength of upper extremities bilaterally. (Id.). He also had full range of motion of the lower extremities with intact reflexes. (Id.). He had edema noted to the right calf down to his toes. (Id.). PA Williams planned to reorder an ultrasound of the lower extremities. (Id.). She also placed Cox on Lasix to see if there was improvement of edema. (Id.). She also discussed Cox's medications with him and encouraged him to return to sick call as needed. (Id.).

Dr. Bora Saikia saw Cox on November 17, 2021, due to his complaints of neck pain and swelling to his legs bilaterally. (Id. ¶ 55). Following an exam, Cox had fluid retention and cervical fusion with pain. (Id.). The plan was to increase

Lasix to 40mg.  (Id.).  Dr. Bora Saikia also noted that although Gabapentin was likely causing fluid retention, the benefits outweighed the risks at that time.  (Id.). she advised that Cox continue all other medications and to follow-up with the previously ordered CT and MRI scans.  (Id.).

On November 29, 2021, Cox asked PA Williams to renew his muscle relaxers until he had a follow-up with a physician.  (Id. ¶ 56).  PA Williams discussed Cox's medications with him, including proper use and potential side effects.  (Id.).  She also discussed his symptoms and encouraged him to return to sick call as needed.  (Id.).

Cox was a no show at sick call on December 7, 2021.  (Id. ¶ 57).

Cox attended the chronic care clinic on December 8, 2021, for dyslipidemia and hypertension.  (Id. ¶ 58).  PA Williams renewed his medications and noted that the results were pending for his recent ultrasound and MRI.  (Id.).

On December 9, 2021, Cox underwent a bilateral lower extremity venous ultrasound.  (Id. ¶ 59).  The study revealed no evidence of bilateral lower extremity deep vein thrombosis.  (Id.).

Dr. Bora Saikia saw Cox on December 15, 2021, due to his complaints of tingling and numbness of the upper and lower extremities.  (Id. ¶ 60).  She noted that he previously had surgery with cervical fusion for spinal stenosis.  (Id.).  Dr. Bora Saikia also noted that he had recently undergone an ultrasound, as well as

21

MRI and CT scans, and noted that the results were not yet available. (Id.). She reviewed Cox's pain management medications and noted that he had side effects from Pamelor. (Id.). Dr. Bora Saikia continued Gabapentin and explained that the dose would not be increased until imaging results were available to assess progression. (Id.).

On December 29, 2021, PA Williams saw Cox for his request for a pain medication renewal. (Id. ¶ 61). PA Williams later noted that she spoke with Dr. Bora Saikia regarding Cox's Baclofen order, and the doctor instructed that there was no indication to renew at that time. (Id.).

PA Williams saw Cox on January 28, 2022, at which time he requested renewal of Tylenol because the commissary did not have the medication. (Id. ¶ 62). PA Williams discussed Cox's medication with him and instructed him to return to sick call as needed. (Id.).

On March 14, 2022, PA Williams saw Cox at sick call for his complaints of pain to the scar on his neck, which was worse while laying down. (Id. ¶ 63). On exam, he had full range of motion and strength of the upper extremities bilaterally but with stated pain to the left shoulder and neck. (Id.). The scar to his neck was healed, and there was no abscess, erythema, or tenderness on palpation. (Id.). The plan was to order an X-ray. (Id.). PA Williams also discussed Cox's medication with him and encouraged him to return to clinic as needed. (Id.).

22

Cox underwent an X-ray of his cervical spine and left shoulder on March 16, 2022. (Id. ¶ 64). The study of the c-spine revealed no radiographic evidence of acute fracture, stable postsurgical changes, and mild multilevel degenerative changes. (Id.). The study of the left shoulder revealed no radiographic evidence of an acute fracture of acromioclavicular separation. (Id.).

Cox underwent an MRI of his cervical spine on March 25, 2022. (Id. ¶ 65). The study revealed post-surgical changes from posterior fusion and laminectomy from C4 to C7. (Id.). The spinal canal was decompressed from C4-C7 levels. (Id.). There was unchanged focal myelomalacia within cervical cord at C6-C7. (Id.). The remaining cervical cord was within normal limits. (Id.). There were signs of congenital narrowing of spinal canal caliber at C2 and C3 levels remaining. (Id.). And there were no areas of foraminal narrowing present in the cervical spine. (Id.).

On April 1, 2022, PA Williams saw Cox at sick call, at which time he asked to review the reports of an X-ray and MRI studies. (Id. ¶ 66). He also asked if his Gabapentin could be increased because he was not sleeping due to neck pain that radiated to the left shoulder and arm with numbness/tingling. (Id.). On exam, he had full range of motion and strength to his upper extremities bilaterally, with pain to the left shoulder. (Id.). The scar to his cervical spine surgical site had healed. (Id.). It was noted that the results of the MRI were still

forthcoming. (Id.). PA Williams planned to discuss Cox's Gabapentin with the site medical director, and she instructed Cox to return to sick call as needed. (Id.).

PA Williams saw Cox on April 6, 2022, at sick call to discuss his recent MRI. (Id. ¶ 67). Cox stated that he still had issues with neuropathy and sleeping. (Id.). He reported taking Tylenol, Celebrex, and Gabapentin. (Id.). PA Williams discussed the results of the MRI with him. (Id.). She noted that the results of a CT scan were still pending completion of the study. (Id.). She noted that once the CT scan results were available, she would place a consult for the neurosurgery follow-up as requested. (Id.). She also planned to discuss his Gabapentin with the site medical director, and she instructed Cox to return to sick call as needed. (Id.).

On April 29, 2022, Cox underwent a CT scan of his cervical spine. (Id. ¶ 68). The study revealed postsurgical changes from prior fusion and laminectomy from C4 to C7. (Id.). The hardware appeared intact, and the spinal canal was adequately decompressed at those levels. (Id.).

On May 6, 2022, CRNP Wesley-Kiepea saw Cox at sick call for his complaints of pain. (Id. ¶ 70). Cox requested to review the results of his CT scan that was conducted on April 29th. (Id.). CRNP Wesley-Kiepea renewed Cox's Baclofen. (Id.). She discussed with Cox that he was on a total of 1,200mg

24

of Gabapentin, so she would not increase his dose of Gabapentin at that time. (Id.).  Cox then requested to see the site medical director.  (Id.).  A task was generated for him to see the medical director, as requested.  (Id.).  He was instructed to return to medical if symptoms worsened.  (Id.).

PA Williams entered an order on May 9, 2022, for new lab work to be obtained for Cox.  (Id. ¶ 71).

On May 11, 2022, Cox asked PA Williams to see the results of his CT scan. (Id. ¶ 72).  PA Williams noted that the results were not yet available.  (Id.).  She noted, however, that Cox had a visit scheduled with the medical director to discuss the results.  (Id.).  PA Williams made a call to ensure the medical director visit was pending and that a neurosurgery follow-up consult request was written. (Id.).

PA Williams saw Cox on May 17, 2022, at which time he requested to review the results of his CT and MRI scans.  (Id. ¶ 73).  Cox reported some issues with swelling to his legs.  (Id.).  He noted that he had an upcoming visit with the medical director to discuss these issues.  (Id.).  PA Williams reviewed the results of the recent tests with him.  (Id.).  She also noted that Cox had neurosurgery consult request pending.  (Id.).  She advised Cox to return to sick call, if needed.  (Id.).

On May 19, 2022, Dr. Bora Saikia saw Cox at medical to discuss his recent MRI findings that were obtained on March 25, 2022. (Id. ¶ 74). She noted that he was seen by neurosurgery on October 4, 2021, in follow-up to his decompression of C4-C7. (Id.). Cox reported ongoing leg swelling despite being on different diuretics in the past. (Id.). That day, Dr. Bora Saikia noted trace edema, and that he was negative for venous insufficiency or clot. (Id.). She noted that he was on Gabapentin and muscle relaxants, from which he was to be weaned off. (Id.). Cox complained of ascending tingling and numbness up to the mid-thigh and also some weakness of the left upper extremity. (Id.). He reported a past drug history of cocaine use. (Id.). Dr. Bora Saikia further noted that Cox was using a wheelchair for long transfers only; he was otherwise able to transfer to the exam chair without any difficulty. (Id.). On exam of his neck, his range of motion was intact without any limitation, and there was some decreased range of motion of the lumbar spine on flexion and extension due to poor effort. (Id.). There were some signs of edema to the extremities. (Id.). Assessment included low back pain and edema to legs, secondary to fluid retention from Gabapentin. (Id.). She noted that he was seen by physical therapy, and he was to continue stretching exercises as instructed. (Id.). She noted that a neurosurgery consult request was pending. (Id.). She also noted that she discussed reports from the MRI and CT with Cox in detail. (Id.). She planned to begin weaning him off of

muscle relaxants and Gabapentin once she received the okay from the neurosurgeon.  (Id.).  She instructed Cox to return to the medical line in two months to reassess.  (Id.).

On May 20, 2022, PA Williams placed a consult request for a neurosurgery follow-up visit.  (Id. ¶ 75).  The appointment was scheduled for August 12, 2022. (Id.).  PA Williams noted that Cox was status/post cervical laminectomy with cervical fusion of C4 to C7 and seen by a neurosurgeon in October 2021.  (Id.). This was a required follow-up for an MRI and CT scans that were both completed and available for neurosurgeon's review.  (Id.).

Cox was reissued a wheelchair on March 25, 2022.  (Id. ¶ 76).

Cox attended the chronic care clinic on June 2, 2022, for dyslipidemia and hypertension where he was seen by CRNP Angela Schweitzer.  (Id. ¶ 77). She began Crestor and instructed Cox to follow-up at the clinic in six months. (Id.).

On June 27, 2022, PA Williams saw Cox at sick call for his request to renew Celebrex.  (Id. ¶ 78).  Cox denied any medical issues at that time, except back pain related to his recent surgery.  (Id.).  It was noted that he had an upcoming neurosurgery consult pending.  (Id.).  He appeared in his wheelchair. (Id.).  PA Williams discussed Cox's medication with him, reviewed orders for his neurosurgery consult, and instructed him to return to medical as needed.  (Id.).

PA Williams saw Cox at sick call on July 13, 2022, for his complaints of swelling to his legs again, despite using Lasix and compression socks. (Id. ¶ 79). PA Williams noted that he had an upcoming neurosurgery consult and an upcoming visit with the site medical director. (Id.). She discussed possible medication changes with Cox. (Id.). He opted to not make any changes until he saw the neurosurgeon and medical director. (Id.). PA Williams also discussed proper use of compression stockings and elevation of his legs and instructed him to return to medical as needed. (Id.).

On August 12, 2022, Cox had an outside neurosurgery follow-up visit with Dr. Lycette at Lehigh Valley Neurosurgery. (Id. ¶ 80). Dr. Lycette reviewed a recent CT scan which revealed postsurgical changes from prior fusion and laminectomy from C4-C7. (Id.). The hardware appeared intact, and the spinal canal was adequately decompressed at those levels. (Id.). Assessment included status/post cervical spinal arthrodesis and cervical radiculopathy. (Id.). Dr. Lycette did not recommend any follow-up visits at that time. (Id.).

PA Williams saw Cox on August 22, 2022, at which time he requested to review the neurology consult report. (Id. ¶ 81). He also requested to have his medication changed for edema, stating Crestor was causing a lot of cramping. (Id.). He reported that he stopped Crestor. (Id.). PA Williams reviewed the

August 12, 2022 neurosurgery consult with him. (Id.). She also noted signs of trace edema to his legs bilaterally. (Id.). She noted that his Lasix (furosemide – used to treat fluid retention from edema) was changed to Bumex (a diuretic). (Id.). She also added Pamelor for neuropathic pain and stopped Crestor, as requested. (Id.). PA Williams also instructed Cox on a diet change. (Id.). She noted that he had upcoming lab work to determine possible need for new cholesterol medication. (Id.). She advised Cox to return to medical as needed. (Id.).

On September 15, 2022, Cox saw Dr. Glen Wheeler at medical in a follow-up to his cervical spine surgery. (Id. ¶ 82). Dr. Wheeler noted that Cox was status/post cervical spine surgery in the form of a fusion of C4-C7. (Id.). Cox denied any GI complaints, but he complained of pain/numbness to the upper extremities and legs. (Id.). Cox appeared at the exam in a wheelchair. (Id.). Dr. Wheeler noted that there was trace to no edema of the legs and no muscle atrophy. (Id.). Cox was considered "stable" and was to follow-up with Dr. Wheeler in four to six weeks. (Id.). Dr. Wheeler also noted that Cox complained of not sleeping well, and he planned to increase his Pamelor to 50mg. (Id.).

Cox was a "no show" for a scheduled sick call on September 23, 2022. (Id. ¶ 83).

PA Williams saw Cox on October 13, 2022, and noted that he had a history of cervical surgery. (Id. ¶ 84). Cox reported weakness of the left leg. (Id.). Cox stated that he could stand but could not feel that he was standing. (Id.). He indicated he had trouble walking. (Id.). He also reported having neuropathy of the left upper extremity since the surgery. (Id.). Cox requested physical therapy since he was last seen in 2021. (Id.). He also stated that he had a mass to the left upper back to the side of the surgical incision that sometimes caused pain as well. (Id.). On exam, he was observed in his wheelchair. (Id.). He was able to use his arms and hands to push his wheelchair up and down the hallway without any difficulty. (Id.). PA Williams noted a well-healed cervical spine surgical scar, and that Cox had full range of motion and bilateral upper extremity strength with intact reflexes. (Id.). Cox was able to stand up from the wheelchair without any assistance and took a few steps without assistance as well. (Id.). PA Williams further noted that there was trace edema bilaterally to the lower extremities, that was improved from prior observations. (Id.). He had 4/5 sensation of the lower extremities from the knee down, and neuropathy. (Id.). PA Williams discussed with Cox that there was probable scar tissue in the back area. (Id.). She offered an ultrasound, but he declined it at that time. (Id.). Cox said he only wanted Celebrex for pain. (Id.). She discussed medication use and side effects with him

and instructed him to return to medical for any symptoms from the medication. (<u>Id.</u>).

On November 7, 2022, CRNP Wesley-Kiepa saw Cox at sick call, at which time he reported pain in the back of his neck extending from his incision line to his head, for a week. (<u>Id.</u> ¶ 85). Cox reported that the pain was gone but there was some tightness, as well as some numbness to the side of his head. (<u>Id.</u>). CRNP Wesley-Kiepa noted that Cox presented to sick call in a wheelchair. (<u>Id.</u>). On exam, there were no signs of redness and/or induration. (<u>Id.</u>). Cox denied pain on palpation. (<u>Id.</u>). An assessment included paresthesia of skin. (<u>Id.</u>). The plan was to increase Pamelor for ten days. (<u>Id.</u>). Cox agreed to the plan. (<u>Id.</u>). CRNP Wesley-Kiepa instructed Cox to follow-up, as needed, if there was no improvement. (<u>Id.</u>).

## III.  <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a).

Initially, the moving party must show the absence of a genuine issue concerning any material fact. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Once the moving party has satisfied its burden, the non-moving party, "must present affirmative evidence in order to defeat a properly supported motion

for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citing Anderson, 477 U.S. at 251). The non-moving party cannot rest upon the mere allegations of his pleading. FED. R. CIV. P. 56(e). "If a party…fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may grant summary judgment or consider the fact undisputed for purposes of the motion. FED. R. CIV. P. 56(e)(2)-(3).

If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968)). Rule 56 mandates the entry of summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. FED. R. CIV. P. 56(e)(1).

## IV.    Discussion

### A.    Failure to Respond to Defendant's Rule 56 Motion

Cox has not responded to defendant's motion for summary judgment or to her concise statement of facts, as required by Local Rules 7.6 and 56.1. As stated in footnote 2, pursuant to Local Rule 7.6, any party who fails to file an opposition brief "shall be deemed not to oppose such motion." M.D. PA. LOCAL RULE OF COURT 7.6; see also Doc. 102. And, as stated in footnote 3, pursuant to Local Rule 56.1, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." M.D. PA. LOCAL RULE OF COURT 56.1; see also Doc. 102. That said, "[w]hen a summary judgment motion is uncontested, the non-responding party does not lose the summary judgment motion by default." Hitchens v. Cnty. of Montgomery, 98 F. App'x 106, 110 (3d Cir. 2004). Instead, when a non-movant does not respond to a motion at all, "a district court must still find that summary judgment is 'appropriate' under [Rule] 56(c) by determining 'that the facts specified in or connection with the motion entitle the moving party to judgment as a matter of law.'" Id. (quoting Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990)).

Due to Cox's failure to respond to defendant's motion for summary judgment, the court must accept all the factual statements in defendant's concise

statement of material facts as undisputed. Nonetheless, the court must still analyze the evidence of record in the light most favorable to Cox as the non-moving party and determine whether the evidence of record supports a finding that defendant is entitled to judgment as a matter of law.

    B.    <u>Eighth Amendment Claim</u>

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege: (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. <u>Id.</u> at 104; <u>see also</u> <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). A prison official manifests deliberate indifference by "intentionally denying or delaying access to medical care." <u>Estelle</u>, 429 U.S. at 104-05. "[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. <u>Harrison v. Barkley</u>, 219 F.3d 132, 138-140 (2d Cir. 2000).

An inmate's claims against members of a prison medical department are not viable under Section 1983 when the inmate receives continuing care, but

believes that more should be done and maintains that options available to medical personnel were not pursued on the inmate's behalf.  Estelle, 429 U.S. at 107.  Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation.  Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

According to the amended complaint, Cox's ailments "started on January 4th, 2021" when he presented to sick call with numbness in his hands and feet. (Doc. 37, at 6).  Cox alleges that, on February 18, 2021, defendant Williams accused him of lying about his symptoms, which "showed that she really wasn't treating [him] for 8½ to 9 weeks." (Id. at 8).  Based on these allegations, it appears that Cox claims that defendant Williams failed to provide adequate medical care from approximately January 4, 2021 through February 18, 2021. The amended complaint does not allege that defendant Williams failed to treat Cox on any other dates.  (See generally Doc. 37).  Thus, during the time period referenced in the amended complaint (January 4, 2021 through February 18, 2021) defendant Williams treated Cox on four occasions—January 11, 2021, January 25, 2021, February 15, 2021, and February 18, 2021.  (Doc. 97-1, at 251-53, January 4, 2021 Progress Note) ("discussed possible causes of back pain. discussed medication options as well. will obtain xray of the spine for diagnostics and further evaluation. Currently has active motrin and [] prednisone

35

order. discussed further tx dependent on results of xray. discussed stretches and exercises. discussed sx in which he should make medical aware through triage or sc. in agreement to plan and has no further questions at this time"); (Doc. 97-1, at 241-43, January 25, 2021 Progress Note) ("discussed medications currently on including proper use and possible side effects. Written consult completed to potentially reschedule nerve block and consult given to medical director for presentation. discussed continuation use of the walker for assistance. Discussed stretches and exercises related to the back. discussed rest as well. Discussed medication ordered to help with constipation. discussed sx in which he is to make medical aware through sc or triage. in agreement to plan and has no further questions at this time"); (Doc. 97-1, at 235-36, February 15, 2021 Progress Note) ("will taper down pamelor d/t stated side effects. discussed approval of nerve block and discussed the delay. cont walker and wheelchair. restrictions changed to have inmate move closer to medical as well as handicap cell. pt edu given. Discussed if no improvement or worsening of sx to make medical aware. sc prnin agreement to plan and no further questions, concerns or complaints at this time."); (Doc. 97-1, at 233-34, February 18, 2021 Progress Note) ("discussed with Dr. Loscalzo. Inmate to be sent OSH for further evaluation via state vehicle as inmate is stable.").

After a thorough and comprehensive review of the record, there is no evidence to permit the trier of fact to find that Defendant Williams acted with deliberate indifference to Cox's serious medical needs. The undisputed record shows that Cox received a significant level of medical care at SCI-Mahanoy, albeit not to his satisfaction. While Cox asserts that Defendant Williams failed to provide adequate medical care for his ailments, the record is replete with evidence that he received continual medical care for his condition. Specifically, the record before the court evinces that Defendant Williams treated Cox on four occasions during the relevant time period, and on numerous other occasions outside that time period. The record also reveals that Cox was seen by other medical staff regularly. The medical records show that Cox: 1) underwent X-rays, a CT scan, and an MRI; 2) was prescribed several medications including Prednisone, Motrin, Torodol, Robaxin, Pamelor, and Gabapentin; 3) was provided with a walker and a wheelchair; 4) was treated by an outside neurosurgeon; and 5) underwent surgery. Further, Defendant Williams continued to monitor Cox's pain, post-surgery condition, and medication regimen. The medical records reveal that medical staff took prompt steps to investigate Cox's complaints, he had numerous follow-up visits, received many medication prescriptions, underwent various diagnostic testing, and received assistive devices. In sum, the uncontroverted record shows that Cox received continuous

and responsive medical treatment throughout his incarceration.  And, despite
Cox's allegation that he was placed on a block that did not allow a wheelchair
(Doc. 37, at 6), the record indicates that when Cox was discharged from the
infirmary on April 20, 2021, he was discharged to a handicap cell with a
wheelchair and walker and was restricted to the bottom bunk/bottom tier.  (Doc.
97-1, at 525-28).  Thus, it appears that Cox's complaint is that he disagreed with
the course of treatment for his medical needs, which, as stated above, does not
give rise to a constitutional claim.  See Monmouth Cnty. Corr. Institutional
Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) ("mere disagreement as to
the proper medical treatment [does not] support a claim of an eighth amendment
violation"); James v. Pa. Dep't of Corr., 230 F. App'x 195, 197 (3d Cir. 2007)
(finding that the district court properly disposed of inmate's Eighth Amendment
claim because the "allegations merely amounted to a disagreement over the
proper course of [inmate's] treatment and thus failed to allege a reckless
disregard with respect to his…care").

Cox also appears to dismiss the comprehensive medical treatment he
received and alleges that Defendant Williams failed to treat him for 8½ to 9
weeks and/or that he received substandard medical care.  (Doc. 37, at 8).  As
outlined in detail above, the medical record clearly indicates that Defendant
Williams treated Cox during the relevant time period.  (See Doc. 97-1, at 233-36,

38

241-43, 251-53).  To the extent that Cox asserts that Defendant Williams'

professional judgment was deficient, this is not enough to rise to the level of a

constitutional violation, and courts will not second guess whether a particular

course of treatment is adequate or proper.  See Parham v. Johnson, 126 F.3d

454, 458 n.7 (3d Cir. 1997) (citing Inmates of Allegheny Cnty. Jail, 612 F.2d at

762).  Furthermore, even if some medical professionals would disagree as to the

appropriate treatment for Cox's condition, the treatment rendered by defendant

Williams would not rise to the level of deliberate indifference.  White v. Napoleon,

897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's

professional judgment does not state a violation of the Eighth Amendment, then

certainly no claim is stated when a doctor disagrees with the professional

judgment of another doctor.  There may, for example, be several acceptable

ways to treat an illness.").

Cox also claims that Defendant Williams accused him of faking his

symptoms.  (Doc. 37, at 6, 8).  Viewing the facts in the light most favorable to

Cox, such activity does not violate his constitutional rights.  A correctional

officer's statement that a prisoner appears to be faking a medical condition does

not violate that prisoner's Eighth Amendment rights.  See Williams v. Comm. of

Pa., 146 F. App'x 554, 557-58 (3d Cir. 2005) (corrections officer's actions in

failing to add prisoner to sick call list and telling other officers that prisoner was

faking injuries, "although regrettable, do not rise to the level of a constitutional violation" under the Eighth Amendment).

Defendant Williams has presented a record that shows she treated Cox on many occasions and did not "deliberately wit[hold] medical treatment[,]" as alleged. (Doc. 37, at 6). As stated, the medical evidence in the record indicates that Cox received continual care for his ailments. Cox cannot rest on the allegations in his amended complaint to defeat a motion for summary judgment. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989). Cox has wholly failed to meet this burden. By failing to respond to defendant's motion, despite being ordered to do so, Cox has not presented the court with evidence on which a jury could return a verdict in his favor under the governing law. Because there are no genuine issues of material fact and defendant Williams is entitled to judgment as a matter of law, the court will grant her motion for summary judgment.

## V.    Conclusion

Consistent with the foregoing, the court will grant defendant's motion (Doc. 97) and enter judgment in her favor.

An appropriate order shall issue.

Date: December 22, 2025

JUDGE JULIA K. MUNLEY
United States District Court